1    UNITED STATES DISTRICT COURT

2    WESTERN DISTRICT OF TEXAS

3    SAN ANTONIO DIVISION

4  UNITED STATES OF AMERICA,  )CRIMINAL NO. 5:11-368-1
                              )
5                             )
   vs.                       )MAY 15, 2013
6                             )
   YADIRA MAURICIO YBARRA,    )
7                             )
   DEFENDANT.                 )

8

9

10              TRANSCRIPT OF SENTENCING
       BEFORE THE HONORABLE ORLANDO L. GARCIA
11                DISTRICT COURT JUDGE

12  APPEARANCES:

13  For the Government:    MARK T. ROOMBERG, AUSA
                           Office of US Attorney
14                         601 NW Loop 410, Suite 600
                           San Antonio, Texas 78216

15

16  For the Defendant:     MOLLY LIZBETH ROTH, AFPD
                           727 E. Cesar E. Chavez Blvd, B-207
17                         San Antonio, Texas 78206

18

19

20

21

22

23

24
    Produced by mechanical stenography; computer-aided
25  transcription

LETICIA O. RANGEL, UNITED STATES COURT REPORTER

P-R-O-C-E-E-D-I-N-G-S

1

2          THE COURT:  Now proceeding to U.S. vs. Yadira

3    Ybarra.

4          MR ROOMBERG:  Mark Roomberg for the United States,

5    Your Honor, present and ready to proceed to sentencing.

6          THE COURT:  Where is the defendant?

7          MS. ROTH:  She is on bond, Your Honor.  She is not

8    present in the courtroom.  I don't know why.  She has

9    appeared at every court hearing, and I anticipate her being

10   here.

11         THE COURT:  Okay.

12         MR ROOMBERG:  Your Honor.

13         THE COURT:  I was going to ask why is she on bond

14   in the first place?

15         MR ROOMBERG:  Your Honor, she was out on bond.  We

16   had moved for detention.  She was placed on bond over

17   objection.

18         THE COURT:  I can't hear you, what?

19         MR ROOMBERG:  I'm sorry.  We had moved for

20   detention.  We had a detention hearing.  She was put on bond.

21         THE COURT:  Did you oppose -- rather, you wanted

22   detention?

23         MR ROOMBERG:  We wanted detention.  We had a

24   hearing on it.

25         THE COURT:  When was that?

LETICIA O. RANGEL, UNITED STATES COURT REPORTER

1      MS. ROTH:  Two years ago.

2      MR ROOMBERG:  That would have been back two years

3  ago.  This has been going on for a long time.

4      THE COURT:  But she has been present at every court

5  proceeding, right?

6      MS. ROTH:  Yes, sir, she has.  We had a full

7  detention hearing with witnesses.

8      THE COURT:  I understand.  When was the last time

9  you talked to her?

10     MS. ROTH:  I can't recall the last time I talked to

11 her.  But the last time she called our office was just a

12 couple of days ago.  She is very attentive to her case, Your

13 Honor, and like I said, has appeared at every court hearing.

14     THE COURT:  Have you tried to reach her today?

15     MS. ROTH:  I have not.

16     THE COURT:  But I still don't understand why she

17 was on bond.  Anyone who has merchandised in trafficking in

18 machine guns has no business being on bond.

19     MR ROOMBERG:  And, Your Honor, we would ask for a

20 bench warrant to issue.

21     THE COURT:  Immediately.

22     CASE MANAGER:  Your Honor, I was advised by

23 Ms. Roth's office she is on her way.  She has called, and she

24 is running late.  She is on her way.

25     THE COURT:  Okay.  Good.  But in any event, she

1    shouldn't have been on bond anyway.

2              MS. ROTH:  She has been in full compliance.

3              THE COURT:  I understand.  But she shouldn't have

4    been on bond anyway.  I mean, anyone trafficking in machine

5    guns, you know -- you know, it's not Girl Scouts cookies out

6    there being trafficked.  Okay.

7              MR ROOMBERG:  And, Your Honor, we will be asking

8    that her bond be revoked and she be taken into custody today.

9              THE COURT:  Right.

10             MS. ROTH:  We will be asking for voluntary

11   surrender, Your Honor.  She is the sole support of her four

12   children.

13             THE COURT:  Okay.  Well, I understand that too.

14   But this case has been pending quite long.

15             MS. ROTH:  It has been, Your Honor.

16             THE COURT:  Yes.

17             MS. ROTH:  And she has been in full compliance for

18   the entire time.

19             THE COURT:  Right.

20             MR ROOMBERG:  In fact, it's actually over two years

21   now.

22             THE COURT:  Right.  Well, when I take her into

23   custody she will be fully compliant.  Okay.  That's it.

24             THE CSO:  All rise.

25             (Recess.)

             LETICIA O. RANGEL, UNITED STATES COURT REPORTER

1          THE COURT:  You may be seated.  Now proceeding to

2   Yadira Mauricio Ybarra, Cause Number 11-CR-368 and 11-CR-977.

3          Ms. Ybarra, have you had an opportunity to review

4   the presentence report in this case?

5          DEFENDANT YBARRA:  Yes, Your Honor.

6          THE COURT:  Do you understand the contents of the

7   report?

8          DEFENDANT YBARRA:  Yes, sir.

9          THE COURT:  Okay.  Counselor, any objections?

10         MS. ROTH:  Yes, Your Honor.  We do have objections.

11         THE COURT:  Okay.

12         MS. ROTH:  The first is about the intended loss in

13   the bank fraud case.

14         THE COURT:  The 977 case?

15         MS. ROTH:  Yes, Your Honor.

16         THE COURT:  Okay.  The intended loss.  Okay.  State

17   your objection on the record.

18         MS. ROTH:  Yes.  Let me point us all to the

19   paragraph.  It's 49 on Page 17 of the PSR.

20         THE COURT:  Let me get to that, Ms. Roth.

21         MS. ROTH:  Yes, Your Honor.

22         THE COURT:  Okay.

23         MS. ROTH:  And our point in raising this objection

24   is that Ms. Ybarra did not have any such intended loss.  It

25   may have been that Mr. Rodriguez whose scheme this was had

1   that intended loss.  But the loss amount that Ms. Ybarra

2   agreed to -- and it was part of her plea agreement, was the

3   actual loss.  She trusts the government's calculation of the

4   actual loss.

5           THE COURT:  And how much is the actual loss?

6           MS. ROTH:  The actual loss is $133,846.09.

7           THE COURT:  Okay.

8           MS. ROTH:  But she was not aware of Mr. Rodriguez's

9   intent to commit the intended loss of between 200 and

10  $400,000, and she did not intend that loss.  So we believe

11  that a ten-level increase is appropriate, not a 12 level.

12          THE COURT:  Ten versus 12?

13          MS. ROTH:  Yes, Your Honor.

14          MR ROOMBERG:  Your Honor, and this is why I asked

15  to have Mr. Rodriguez and Ms. Ybarra sentenced at the same

16  time.  If you recall, the last time we were here,

17  Mr. Rodriguez -- you sentenced Mr. Rodriguez.  And he of

18  course said that Ms. Ybarra was the ringleader, and she was

19  the one who directed everything.

20          THE COURT:  Right.

21          MR ROOMBERG:  The government's viewpoint on it is

22  they were jointly responsible for this conspiracy.  Their

23  acts they did where they were both working together and all

24  other acts that they were doing whether or not they were

25  equally split or not was a reasonably foreseeable part of the

1   conspiracy and therefore the presentence investigation report

2   is correct.

3            The intended loss under the guidelines was the

4   $230,680.  It is our position that she was one of the

5   ringleaders, and she knew of it.

6            THE COURT:  Okay.  Anything else, Ms. Roth?

7            MS. ROTH:  Yes, Your Honor.  It's clear even from

8   the facts that are listed in the plea agreement to which

9   Ms. Ybarra agreed, except for she did not initial one page,

10  and that's an issue of another objection.  But, in any

11  regard, the facts even in the plea agreement show that this

12  was Mr. Rodriguez's scheme.  Did Ms. Ybarra help him?  Yes.

13  But she did not know all of the extent of the conspiracy,

14  could not have foreseen this amount, should not be held

15  liable for anything other than the actual loss because there

16  isn't evidence that she could foresee this amount.

17           Mr. Roomberg's quickly stated statement that even if

18  the activities weren't equal, he believes that this was part

19  of the conspiracy and she should be held accountable.

20           THE COURT:  Uh-hum.

21           MS. ROTH:  Is very telling because the acts were

22  not at all equal and just the face of the factual recitation

23  in the plea agreement shows that.  It lists what

24  Mr. Rodriguez did on multiple occasions.

25           THE COURT:  Right.

1    MS. ROTH:  Ms. Ybarra helped facilitate some of his

2    actions.

3    THE COURT:  Right.

4    MS. ROTH:  But this was not her scheme.

5    THE COURT:  But it's part of the conspiracy.

6    MS. ROTH:  Not a foreseeable part of the

7    conspiracy, Your Honor, and that's the issue here.

8    THE COURT:  Okay.  And your second objection?

9    MS. ROTH:  The second objection is to Paragraph 52

10   that recommends a three-level upward adjustment for the bank

11   case.

12   THE COURT:  For the what?

13   MS. ROTH:  On the theory that Ms. Ybarra was a

14   manager or supervisor.

15   THE COURT:  Okay.

16   MS. ROTH:  And that's simply not accurate.

17   THE COURT:  Okay.

18   MS. ROTH:  She did get -- and we are not objecting

19   to -- she did get a recommended adjustment for abusing

20   position of trust.

21   THE COURT:  Right.

22   MS. ROTH:  That -- we're not objecting to that.  It

23   is true that she had a position of trust in the bank as it

24   relates to this offense, and we're not objecting to that.

25   But this is different.  This is saying that she was a manager

1　　or supervisor in this scheme, and she simply wasn't.  When we

2　　look at 3 b.1.1 there are several considerations for

3　　determining whether someone is a manager or supervisor.  One

4　　of those is a claim to a greater share of the profits.  That

5　　is not at all what happened here.  In fact, Ms. Ybarra hardly

6　　profited at all and certainly was not claiming a larger share

7　　of the fruits of the crime.  Mr. Rodriguez, again, this was

8　　his scheme.  It was related to a family problem of his and

9　　she assisted him.  But she was not acting in a managerial or

10　　supervisory capacity.

11　　　　　　We have objected -- and I had asked the probation

12　　office to give you our full written objections because we were

13　　very specific.

14　　　　　　THE COURT:  Right.

15　　　　　　MS. ROTH:  And I hope that they attached those to

16　　the PSR.

17　　　　　　THE COURT:  Yes, they did.

18　　　　　　MS. ROTH:  In addition to summarizing our

19　　objections as they do.  But we have also objected to --

20　　　　　　THE COURT:  Let me -- hold on, Ms. Roth.

21　　　　　　MS. ROTH:  Yes, Your Honor.

22　　　　　　THE COURT:  What is the government's response?

23　　　　　　MR ROOMBERG:  Your Honor, this is all covered from

24　　the factual basis for the guilty plea.  The defendant signs

25　　the agreement, and by signing the plea agreement, the

1  defendant admits to the facts set out in the factual basis

2  are relevant as alleged by the government are true and

3  correct.

4           In the first paragraph it talks about how this

5  defendant along with Rodriguez and Martinez created a scheme

6  to take funds.  That this defendant along with Martinez and

7  Rodriguez would be the -- researched the names of the account

8  holders and the bank account numbers and create false deposit

9  slips.  She is admitting to the managerial role in the plea

10 agreement.  And if we go back to the intended loss, the last

11 paragraph, which she did initial:  The defendants attempted to

12 fraudulently obtain $230,680.00 and did actually and

13 fraudulently obtain and unlawfully profit or attain

14 $133,845.00.

15           THE COURT:  All right.

16           MR ROOMBERG:  All of these things are in the agreed

17 factual basis.

18           THE COURT:  And your third objection, counselor?

19           MS. ROTH:  Your Honor, if I just put on the second

20 one, we specifically objected to certain facts, and we do not

21 agree that the factual basis which we carefully reviewed

22 before entering into this agreement--

23           THE COURT:  Right.

24           MS. ROTH:  -- and before going to court supports

25 this role adjustment.  It simply doesn't.

1           THE COURT:  Okay.  Okay.  And your third objection?

2           MS. ROTH:  Ms. Ybarra stated specifically that she

3    does not agree with the factual summaries in the presentence

4    report.  She stands by the facts that she agreed to in the

5    two plea agreements.  That she does very clearly.  She did

6    not, for instance, recruit Ms. Roque as part of the

7    conspiracy, and that's listed in the PSR.  It's not listed in

8    the plea agreement.

9           THE COURT:  Does that affect the guideline

10   calculation?

11          MS. ROTH:  It does.  That's one of the issues

12   concerning the second objection about the manager or

13   supervisor role.

14          THE COURT:  The number of participants?

15          MS. ROTH:  No, Your Honor.  That's not -- that --

16   we're not objecting to that.  But whether she acted a manager

17   or supervisor, we are clearly stating she did not and have

18   listed several factual disputes we have with that in our

19   written objections.

20          THE COURT:  All right.

21          MS. ROTH:  You had asked for the third objection,

22   Your Honor?

23          THE COURT:  Right.

24          MS. ROTH:  The third objection is to Paragraph 42.

25   And the fourth and final objection is to Paragraph 43.

1          THE COURT:  This is your third or fourth objection?

2          MS. ROTH:  Well, the third objection is to

3   Paragraph 42.

4          THE COURT:  Okay.

5          MS. ROTH:  And the fourth objection is to Paragraph

6   43.

7          THE COURT:  Well, let's take up Paragraph 42.

8          MS. ROTH:  Okay.  They're related a little bit,

9   Your Honor.

10         THE COURT:  Okay.

11         MS. ROTH:  And that's why I.

12         THE COURT:  All right.

13         MS. ROTH:  Your Honor set this for an evidentiary

14  hearing because of what I had mentioned at the bench.  And I

15  don't know -- I would appreciate if we could approach the

16  bench on the first part of this objection.

17         THE COURT:  Sure.  On Number 42?

18         MS. ROTH:  Forty-two and 43.

19         THE COURT:  Okay.  Go ahead.

20         MS. ROTH:  May we approach?

21         THE COURT:  Yes.

22         (At sidebar.)

23         THE COURT:  Let's get this on the record.

24         COURT REPORTER:  Yes, sir.

25         THE COURT:  Okay.  State your objections.

1          MS. ROTH:  Okay.  The government has made a comment

2    to you that the 5-K is filed only in the bank fraud matter.

3          THE COURT:  Right.

4          MS. ROTH:  And I understand that Mr. Roomberg wants

5    to make it clear that his motion is because only of what she

6    did in the bank fraud case.

7          THE COURT:  Right.

8          MS. ROTH:  And I understand that he's making that

9    clear.  However, legally under the guidelines, we are here

10   today on one sentence, one solitary sentence.  This matter

11   has been grouped under the guidelines and the 5-K applies to

12   the entire sentence when we are talking about your discretion

13   in granting it.

14         THE COURT:  Right.

15         MS. ROTH:  And I just need that to be clear.  That

16   is very clear.  Under the guidelines, there is no case law

17   supporting.

18         THE COURT:  Okay.  And what's the net effect

19   whether it applies to both cases or one case?

20         MS. ROTH:  It doesn't matter.  It's your

21   discretion.

22         MR ROOMBERG:  It would be in the end a one-point

23   departure from the total guidelines which would bring her

24   down to the guidelines she would have gotten just for the

25   machine gun case.

1          THE COURT:  The what?

2          MR ROOMBERG:  It would bring her down to the

3     guidelines that she would have gotten had she just pled

4     guilty to the machine gun case.

5          THE COURT:  Okay.  All right.

6          MS. ROTH:  The second thing that I disagree with is

7     Mr. Roomberg's -- well, actually we're not in disagreement

8     about that.  Ms. Ybarra's debriefing was extensive and

9     forthright.

10         THE COURT:  Did it produce anything?

11         MR ROOMBERG:  It produced nothing.  In fact, she

12    did not follow the instructions of the agents.  And the

13    instructions were clear and explicit with the agents and

14    myself that she needed to stay in contact.  She needed to

15    show the Court.  If she had any other contact with any other

16    suspects, she had to notify them immediately.  She did not do

17    that.

18         THE COURT:  None of that was not done?

19         MR ROOMBERG:  None of it.

20         MS. ROTH:  Well, may I address that?

21         THE COURT:  Yeah, of course.

22         MS. ROTH:  She met with agents in long debriefing

23    sessions at least three times.  I was present and Mr. Eerie

24    from my office was present for the part of one.

25         THE COURT:  Uh-hum.

1      MS. ROTH:  She met with ATF agents, ICE agents, DEA

2  agents.  She opened up her Facebook so that she could

3  identify people, in fact, including she identified the people

4  who were  listed in the PSR on Page 7.  Paragraph 13 was not

5  identified.

6      THE COURT:  Right.

7      MS. ROTH:  She identified them.  She spoke

8  extensively about things that the government didn't know

9  including history of how she got involved in this in the

10  first place.

11      THE COURT:  Right.

12      MS. ROTH:  Drug trafficking activity that's not

13  alleged.

14      THE COURT:  Right.

15      MS. ROTH:  Anywhere against anyone.

16      THE COURT:  Right.

17      MS. ROTH:  The hierarchy of people.

18      THE COURT:  But none of that yielded any fruit for

19  the government?

20      MS. ROTH:  That's correct.  And our only difference

21  on that point is that she did do text contacts.  In fact, I

22  gave a copy of the screen shots of the text contacts to

23  Mr. Roomberg.

24      THE COURT:  Right.

25      MS. ROTH:  She did make recordings.  She was

1 subsequently evicted from her house because they read the

2 news about this charge and kicked her out.

3        THE COURT:  What does that have to do with

4 anything?

5        MS. ROTH:  Because she was not able to give them

6 the recordings.

7        THE COURT:  Right.  Okay.  The government

8 understands that.

9        MS. ROTH:  We tried to reestablish a relationship.

10        THE COURT:  I understand.

11        MS. ROTH:  And that was not--.

12        THE COURT:  Right.

13        MS. ROTH:  We were not given that opportunity by

14 the government.

15        THE COURT:  Right.

16        MS. ROTH:  She was not only a victim once during

17 this two-year period.  She has had a series of financial

18 struggles that have led her from one house to the next.

19        THE COURT:  I understand.

20        MS. ROTH:  She has been stable now for quite

21 sometime.

22        THE COURT:  Okay.

23        MS. ROTH:  But in my judgment, from all the

24 debriefings I have sat in in my life, this is not a situation

25 where she was unwilling.

THE COURT:  Well, she was willing, but it produced
nothing.

MS. ROTH:  That is accurate.

THE COURT:  Okay.  She was willing, but it produced
nothing.

MS. ROTH:  That is accurate.

MR ROOMBERG:  And we're not using anything that she
told us.  We haven't used that against her.  We don't intend
to use that against her.  But other -- the fact of the matter
is she did not follow the agent's instructions.

THE COURT:  She did what?

MR ROOMBERG:  She did not follow the case agent's
instruction.  The case agent's cell phone numbers never
changed.

THE COURT:  It produced nothing.

MR ROOMBERG:  She never called them.

MS. ROTH:  Well, I mean she has been on electronic
monitoring for the whole two years.  It's not like they
didn't know where she was.

THE COURT:  Okay.  Anything else?

MS. ROTH:  No, except that I do -- as part of your
discretion, you can recognize her forthrightness when you're
deciding how low a sentence to impose.

THE COURT:  Right.  Sure.

MS. ROTH:  You can recognize her forthrightness

1   that she was upfront from the very beginning.  This is a

2   situation where she proffered information on her own.  It was

3   not a situation--

4           THE COURT:  Right.

5           MS. ROTH:  -- where we were asked to consider that.

6           THE COURT:  Okay.  Anything else?

7           MR ROOMBERG:  Two things:  One, because Ms. Roth

8   brought it up, if this question was put to the case agent, he

9   would say that the agents felt that she was playing them.

10          THE COURT:  She was what?

11          MR ROOMBERG:  Playing the agents and trying to

12  manipulate the agents.  And that's why she never followed

13  their instructions.

14          THE COURT:  Okay.

15          MS. ROTH:  Oh, I so disagree with that.

16          THE COURT:  We're not going go there anyway.

17          MR ROOMBERG:  Make sure this is on the record.  I

18  would proffer the transcripts and the information that is

19  contained in the government sets and memorandum is true and

20  accurate that we knew before any debriefings that Ms. Ybarra

21  was the one who was the ring leader of this machine gun

22  trafficking case and that--

23          THE COURT:  Right.

24          MR ROOMBERG:  -- the agents knew it.  Case Agent

25  Mark Gonzalez is present and available to testify to that and

1   as to the accuracy of every statement that is made in the

2   government's sentencing memorandum.

3            THE COURT:  Okay.

4            MS. ROTH:  Could I ask that the government

5   sentencing memorandum, because he mentions the 5-K in there,

6   be placed under seal.

7            THE COURT:  We'll place it under seal.

8            MS. ROTH:  They filed it without sealing it, and I

9   think it needs to be under seal.

10           MR ROOMBERG:  Okay.  That's fine, if the Court

11  wants to, that's fine.

12           THE COURT:  It's under seal.

13           CASE MANAGER:  Yes, Your Honor.

14           THE COURT:  Anything else?

15           MS. ROTH:  Only to note when Mr. Roomberg says ring

16  leader, I mean he certainly knows and it's within the PSR

17  there were people far above Ms. Ybarra.

18           THE COURT:  Okay.  Let's go.

19           (End of sidebar.)

20           THE COURT:  Okay.  Any other objection, counsel?

21           MS. ROTH:  Your Honor, the final objection is with

22  respect to the imposition of the adjustments in Paragraph 42

23  and 43.  Application Notes 13 and 14 of 2K 2.1 B5 and B6

24  mandate that both of these not be imposed.  One or the other.

25  If Your Honor is going to impose one or the other, it should

1  be one or the other and not both, and that is simply a

2  guideline application issue.  Imposing both constitutes

3  improper double counting and should not be done.

4          THE COURT:  Okay.  Any response?

5          MR ROOMBERG:  Your Honor, first of all, this is the

6  first time that counsel has raised this objection.  In every

7  gun case where we've had trafficking going south both of

8  these have been imposed.  Both of these are appropriate in

9  this because we have both engaging in trafficking in firearms

10 in Mexico to the cartels as well as believing that they would

11 we transported out.  I believe in particular 2K 2.1 B6 A with

12 the understanding that it will be used in a further felony.

13 So both of these 42 and 43 are correct.  They are following

14 what the guidelines recommend, and that she should be added

15 with both of these.

16         MS. ROTH:  Your Honor, actually, I first raised

17 this in written objections that Mr. Roomberg received on

18 September 22, 2011, so this is certainly not the first time

19 I've raised this.  It's been raised.

20         THE COURT:  Okay.  All right.

21         MS. ROTH:  Again, I'm pointing to the plain

22 language of the guideline in Application Notes 13 and 14 of

23 2K 2.1

24         THE COURT:  Okay.

25         MS. ROTH:  That's directly applicable here, and it

LETICIA O. RANGEL, UNITED STATES COURT REPORTER

1  talks about B5 and B6.

2          THE COURT:  Okay.  Any other objection?

3          MS. ROTH:  No, Your Honor.

4          THE COURT:  Okay.  There being no objections, now

5  given the matter, I think the range -- okay, all objections

6  are overruled in that the Court adopts the factual statements

7  contained in the presentence report as to which there were no

8  objections.

9          And as to the controverted matters, the Court makes

10 the following findings:  The Court finds that the four-level

11 enhancement at U.S. Sentencing Guideline Section 2K 2.1 B6

12 applies as the transfer of the firearms from Mexico would

13 cause or reasonably that they would be used or possessed in

14 connection with another felony offense.

15         The Court further finds that the total amount of

16 intended loss is $230,680, and the guideline level is

17 appropriately calculated based on that amount.

18         Further, the Court finds the defendant participated

19 in identity theft and specific offense characteristics as

20 indicated in 2B 1.1B 11 CI.

21         Further, the Court finds the defendant had an

22 aggravating role in the offense by acting as the leader of a

23 criminal organization involving at least five persons in

24 furtherance of the scheme.  The guidelines are correctly

25 applied and thus calculated.

1    Now, the guideline calculation as agreed upon by you
2    all is 87 to 108 months; is that correct?
3    MR ROOMBERG:  Yes, sir.
4    THE COURT:  Okay.  The guideline range then would
5    be 87 to 108 months.  The supervised release range would be
6    one to three years on Cause Number 11-368.
7    Two to five years on Cause Number 11-977.  The fine
8    range for both cases would be 15,000 to one million dollars.
9    The restitution amount would be $133,846.09.  The special
10   assessment of $100 would be due on Cause Number 11-CR-368.
11   And $200 -- rather $100 on Cause Number 11-CR-977 for a total
12   of $200.
13   Any allocution by the government?
14   MR ROOMBERG:  Your Honor, we just ask the Court
15   stay within the guideline range of 87 to 108 months.
16   THE COURT:  Ms. Roth.
17   MS. ROTH:  Your Honor, I would first just to make
18   sure that the record is clear, we did object to several facts
19   and stated in our written and oral presentation that
20   Ms. Ybarra agrees with the facts that are in her plea
21   agreements.
22   THE COURT:  Right.
23   MS. ROTH:  And would disagree with many of the
24   facts that are in here.  And then, Your Honor, secondly, the
25   issue about identity theft, we would object that there was

1  any identity theft here.  I'm not sure -- that wasn't a

2  disputed point.

3          THE COURT:  Okay.  If that was not part of any

4  objection, that will be withdrawn.

5          MS. ROTH:  Thank you, Your Honor.  I appreciate

6  that.

7          Your Honor, for Ms. Ybarra what speaks most loudly

8  and clearly are the three letters that you have before you.

9  One is from her sister Hilga who is in the courtroom today.

10  One is from the pastor of her church, Jeffrey Cummin.  And the

11  other is from a good friend, long time friend of Ms. Ybarra's

12  who knows her and the way in which she takes care of her

13  children.  She writes:  In closing I would like to say that

14  her children's lives more than anyone else's have been torn

15  apart.  The one person who had been there for those children

16  and present in their lives is their mother.  They need to be

17  with her -- they need her to be with them every day to raise

18  them and give them unconditional love as absolutely no one

19  else would be able to do that in her absence.

20          Mr. Cummin, the pastor of Rivers of Life Church, has

21  known her for a while, and his letter shows how she has taken

22  rehabilitative steps on her own since this arrest.  As we

23  noted, she has been on bond since April 22nd, 2011.  That's

24  over two years.  She has been in compliance that entire time,

25  and subject to electronic monitoring that entire time.  She

1   has gained employment.  Before this incident, she had been

2   employed steadily for many years.  She has been the sole

3   supporter and main financial support of her family whether her

4   husband was incarcerated or at home for many, many years.  She

5   has four children.  The youngest are -- the youngest two are

6   under ten, and the oldest is in high school.

7          She became unemployed after her arrest but has since

8   regained employment.  And once again, as you'll see in a

9   moment when you talk to her, her charismatic character, has

10  helped her rise up in her employment.  She has been doing very

11  well.  She is described as a caring, giving person.  I add to

12  that that she is very good at networking.  And what I mean by

13  networking is drawing people together.  If she sees a need,

14  she meets a need by someone else she knows or by something

15  that she herself can do to provide for that need, and that is

16  listed in -- that is evident, rather, in these three letters

17  that you have before you.  This is a person with no prior

18  criminal history who committed two offenses and is now before

19  you on two very serious charges.  She has no prior criminal

20  history.  And that's significant not only by the way that she

21  is sentenced in relation to other people that you have seen in

22  relation to these cases.  It's also significant in her

23  rehabilitative efforts and in the fact that she will not be

24  returning to this kind of life.

25          The guidelines, even when calculated as we suggest,

which is the low end of 57 months are too high in our opinion
to reflect the purposes of sentencing here.  They don't take
into consideration her truly roiling state of mind at the time
that she committed these offenses.  Ms. Ybarra came from a
very large family.  She is very close to her family and her
sisters.  At the last hearing, the courtroom was at least a
quarter full of people who came to support her.  She did not
want to ask them to come back today, but her sister is here,
and the support remains.

Her household, unfortunately, as a child for her was
a troubled one.  Her sister experienced abuse.  Her mother
experienced abuse.  She and Hilga, Yadira and Hilga, really
clung to each other.  And when -- as soon as she could, she
left her home for the safety of another sister's home.
Sometimes what happens in that situation is that as an adult
some of those patterns are repeated.  And, unfortunately,
Ms. Ybarra had some of that tracking of the troubles of her
youth in her adult marriage in life.  Her marriage has been
very rocky.  Her husband betrayed her.  She herself was
subject to abuse.  And then what was the turning point in her
life was when one of her husband's relatives sexually
assaulted her oldest daughter.  He was prosecuted much later
and given a sentence of probation.  In light of what she had
been through in her life, that kicked off a switch in her, and
she lashed out at the unfairness of the criminal justice

1    system in a way that ended up hurting her far more.

2           The important point here is to recognize that, but

3    to also recognize what she has done from the date of her

4    arrest forward for these past over two years.  She has

5    participated in counseling.  She has turned back to a

6    supportive church.  She has reached out to family members

7    again, supports them and allows herself to be supported by

8    them.  And all the indications are that she will continue to

9    be the law-abiding citizen that the system witnessed her be

10   during these past over two years.  So we are asking that Your

11   Honor not put her in jail.  Her children need her.  You know,

12   Your Honor, that that is often the case.

13          THE COURT:  You mean, not in jail today or not in

14   prison?

15          MS. ROTH:  Not in prison.

16          THE COURT:  Okay.

17          MS. ROTH:  We are also asking if Your Honor imposes

18   a sentence of imprisonment, that she not be imprisoned today.

19   The fact that a person's children need him or her is

20   something that you hear often, and it's a true statement.

21   But it's not always the statement that you might be able to

22   address in sentencing.  I'm asserting that this case is

23   different.  First of all, Ms. Ybarra has been the sole

24   provider for her four children always whether her husband was

25   present at the house or not.  She has been their sole

emotional and financial support. She continues to be. And
separating them from her longer than is absolutely necessary
doesn't benefit society. Doesn't benefit them. It doesn't
benefit her. It doesn't provide corrective action for her.
She has taken corrective and rehabilitative action during
these past two years.

        THE COURT: Right.

        MS. ROTH: The other reason is -- this relates to
the children, is that she has proven herself and her law
abiding life even more than a person on bond who normally
appears before you has. She has been on bond for over two
years. As I mentioned, she has been under electronic
monitoring that entire time and in especially close contact
with the Pretrial Service Office. She has been in
compliance. And although she did wrong, and she did wrong,
acknowledged it. And as we talked about at the bench, made
every conceivable effort to right that wrong. She is not
going to be doing wrong again. And I think that she has
proven that already in these two years.

        THE COURT: Uh-hum.

        MS. ROTH: So that's the basis of our request, Your
Honor.

        THE COURT: Okay.

        MS. ROTH: I know that she would like to speak with
you.

1          THE COURT:  Of course.

2          Ms. Ybarra.

3          DEFENDANT YBARRA:  Yes, sir.  In respect to my

4    children, you know, I acknowledge every single day I live it,

5    in what I did wrong.

6          THE COURT:  You acknowledge what?

7          DEFENDANT YBARRA:  I acknowledge every wrongdoing

8    that I have done especially on that day.  I've acknowledged

9    as to why it was done.

10         THE COURT:  Which day are you talking about?

11         DEFENDANT YBARRA:  When I was arrested.

12         THE COURT:  When what?

13         DEFENDANT YBARRA:  When I was arrested.

14         THE COURT:  Okay.  Are you talking about the

15   activity at Wells Fargo or are you talking about trafficking

16   in machine guns?

17         DEFENDANT YBARRA:  In both.

18         THE COURT:  All of it.  All of it.

19         DEFENDANT YBARRA:  Everything.  Every single thing.

20   It's not an excuse, but if I may, at the time -- I'll get

21   back to the time at the bank.  I was not all there.  I was

22   not mentally and physically there.  My daughter just did an

23   outcry.  She just informed me that she was physically raped.

24   And my son physically abused.  So I was always working.  I

25   work two jobs.  My sister and my family can tell you.  I was

1   always working.  I didn't think anything of it.  I didn't

2   think these activities were going on in my home.  When the

3   outcry happened -- I've always been a person that is very

4   strong.  When my sister Hilga, as young -- when I was seven

5   years old that she had did an outcry to me and told me she--.

6           THE COURT:  I understand.  Let me ask you

7   something:  What compelled you to go out and traffic and sell

8   and take and traffic in machine guns?

9           DEFENDANT YBARRA:  In the -- I was -- I wasn't

10  thinking.  I was not at the level where I can say that I was

11  at a level head.  I was very hurt and upset that they gave--.

12          THE COURT:  You understand that these machine guns

13  were going to Mexico?

14          DEFENDANT YBARRA:  I do understand that.

15          THE COURT:  And of course it doesn't really matter

16  where they were going.  Wherever they were going, they

17  ultimately were going to go to harm somewhere whether it was

18  Canada, North Texas, South Texas, or in Mexico, right?

19          DEFENDANT YBARRA:  I understand.

20          THE COURT:  And where did you get these weapons?

21          MS. ROTH:  Your Honor, this was a reverse sting.

22          DEFENDANT YBARRA:  Yeah.

23          THE COURT:  Okay.  Who were you going to give them

24  to?

25          DEFENDANT YBARRA:  It was -- that day all I got a

```
 1   call in the morning was, you know, that who I reported to the
 2   Comandante, he just said:  I need you on this job, and I
 3   said, okay.  Why?  Because never anybody -- you never send --
 4   as close ties that I had at that time, you never send anybody
 5   so close to you that can get hurt or something happen to them
 6   to any type of arrangement like that.
 7            THE COURT:  Okay.
 8            DEFENDANT YBARRA:  And because there was, you
 9   know -- this actually -- this thing was Willy Mendoza who was
10   with me.  He was trying to move up in rank.  So, you know,
11   the Comandante requested me to show up.
12            THE COURT:  Okay.  All right.  Continue where you
13   left off.
14            DEFENDANT YBARRA:  In regards to my children?
15            THE COURT:  Yes, wherever you wish to continue.
16            DEFENDANT YBARRA:  Okay.  I just want to tell you,
17   Your Honor, that it -- I've always been strong.  I've never
18   known how to run to anybody to ask for help.  I always figure
19   it out.  So as a young age seven when my sister did the
20   outcry, I told my sister I would always be her keeper and
21   make sure that nothing ever happens.  So when it happens to
22   my daughter, and it regresses me into seeing my children and
23   then going through the counseling and then getting the
24   questions asked and reading how it actually happened to my
25   daughter, I was not all there.  I was being abused by my
```

husband.  I was being attacked by the members that he was

being affiliated.  So I was always protecting my children.

Protecting myself.  Protecting him.  It was very hard for me

at that time when the outcry happened to actually say that I

had this.  I know what I was doing because I wasn't.  This

time something--.

THE COURT:  You're telling me that you did all this

because your husband or someone else told you to do it?

DEFENDANT YBARRA:  No.

THE COURT:  No.

DEFENDANT YBARRA:  No, I'm telling you I did all

this.

THE COURT:  You did it because you did it, right?

DEFENDANT YBARRA:  I did all this--

THE COURT:  Right.

DEFENDANT YBARRA:  -- because of the hurt, the

anger, and everything just seeing my children go through it,

and he gets deferred adjudication, after he -- how viciously

he attacked my daughter.

THE COURT:  Right.  I understand all that.  But do

you understand that you were trafficking in machine guns.

That's what I want to understand.

DEFENDANT YBARRA:  That -- the machine guns, that

was the first time that I was going to go ahead.

THE COURT:  How many machine guns did you

1 facilitate or transfer or give?

2       DEFENDANT YBARRA:  Machine guns in the time?

3       THE COURT:  At any time.  How many total machine

4 guns have you dealt with?

5       MS. ROTH:  Your Honor, this was a reverse sting, so

6 the officers brought the machine guns.

7       THE COURT:  Okay.  I understand.  But you knew what

8 you were doing, right?

9       DEFENDANT YBARRA:  Prior before I had to go under a

10 demand.  And if that demand is what he requested, regardless

11 of what product it's going to be, if it's going to be the

12 firearms or if it's going to be cocaine.

13       THE COURT:  Right.  All right.  Go ahead.

14       DEFENDANT YBARRA:  That's basically what I wanted

15 to tell you.  It's just I have since it happened, I have

16 fully completely changed, but it comes with losing a lot.

17       THE COURT:  Right.

18       DEFENDANT YBARRA:  I hear the punishments, and I

19 hear everything that you know she should be punished in this

20 range.  She should be punished.  I have lost a lot.  I have

21 lost a lot in regard to it's very hard to live on a daily

22 basis with my name.  Any time I've lived in a home, I've come

23 to courts, the newspaper sends it out.  And the next thing,

24 you know, I have sheriffs kicking me out, throwing my stuff

25 out, coming in here and asking how many firearms do I have.

1  And they specifically ask in front of my children.  It's

2  happened to me three times.  Employment has been very hard.

3  Thank God I got one.  And even now trying to come to court

4  trying to -- it's just every single aspect in my life since

5  that day, I've lost a lot.

6          THE COURT:  Uh-hum.

7          DEFENDANT YBARRA:  And to a point where every day I

8  live thinking, my children, my children, my children, my

9  children, and it's always been that way in regards to the

10 love of the mother to the children.

11         MS. ROTH:  Again, Your Honor, Ms. Ybarra has always

12 been the sole support of her children.

13         THE COURT:  Uh-hum.

14         MS. ROTH:  And I think the letters clearly display

15 that to you by people who have known her for longer than I

16 have.

17         THE COURT:  Right.

18         MS. ROTH:  Her job at West Business Solutions has

19 been very wonderful for several months now.  And it has led

20 to significant stability.  Prior to this arrest or prior to

21 her involvement in these two cases, she had excellent

22 employment.  She was not able to finish high school and not

23 able yet to get her GED and she had very solid employment.

24 And as she said, she often was working two jobs.  Many times

25 more than one job.  She has moved up in West Business

Solutions.  Has been recognized.  When you talk with

Ms. Ybarra, it's evident why the letters talk about her as a

positive person, a go getter, a leader, someone who, as her

sister writes, is in a leadership position, and that's with

reference to West Business Solutions, with numerous

responsibilities.  Again, demonstrating continued success.

Many coworkers, managers, and peers express their gratitude

for Ms. Ybarra's can do attitude, warming smile, and

spiritual encouragement.  She provides feedback to managers

on processes and procedures and has been instrumental in the

success of the project.

Before you today you have a person who really

presents two questions in my mind:  Why did she do this?  And

what's going to happen next?  I'm going to analogize the why

did she do it to some studies that show that often when a

person is in an abusive relationship that person will

shoplift.  A person who with no criminal history, a person in

that person's 40s or 30s who has never had any encounter with

the law.  The idea that a person lashes out in response to an

injustice and lashes out in a wrong way is one that is

recognized by social science.  Here Ms. Ybarra lashed out in a

very big way in comparison to my analogy.

THE COURT:  Right.

MS. ROTH:  But that is nevertheless the phenomenon

that took place.  And, honestly, in light of all of her life

LETICIA O. RANGEL, UNITED STATES COURT REPORTER

1    and especially with her own history with abuse, what happened

2    to her daughter was much larger than just abuse to her from a

3    spouse.  In other words, the lash-out was significantly

4    greater than my analogy, but so was the perceived injustice.

5    Does that excuse her behavior?  No.  And we stated that in

6    writing.  I stated that today, and you heard that from

7    Ms. Ybarra.  She is not offering that as an excuse.  But it

8    does answer the question of why did she do it.

9            Then the second part is what's next?  And I'm asking

10   you not to incarcerate her any further than she has been

11   incarcerated because for the past over two years she has

12   proven that she has chosen a law abiding life.  And I believe

13   that to be continuing.

14           MR ROOMBERG:  Your Honor, if I may briefly respond.

15   Yes, Ms. Ybarra had employment.  She used that opportunity at

16   Wells Fargo to rip of innocent depositors who had no idea

17   that she was stealing their money along with the other people

18   that she helped organize.  I agree with Ms. Roth, this case

19   is different.  This case is different because here she has

20   committed two completely separate crimes:  Bank fraud against

21   innocent victims and trafficking in machine guns.  And

22   because the way the guidelines are, really she is getting

23   concurrent time.  She is getting a two for one.  So she gets

24   to do her own crime spree and not suffer any additional

25   consequences for committing different crimes.

1        As she pointed out and as is apparent from the

2   transcripts that we've entered in our sentencing memorandum,

3   the Comandante called her because Willy Mendoza wanted to move

4   up, so that's who they called to help.  We have her talking

5   about this in the transcripts prior.  This is why he sent me

6   because I know the people.  This -- based on the transcripts,

7   and the transcripts alone, this was not her first rodeo.  And

8   the most telling thing about her family values, frankly, is

9   the last transcript, C27, track one, what we have is them

10  discussing about selling grenades in the future and also--.

11          THE COURT:  Selling what?

12          MR ROOMBERG:  Grenades in the future.

13          THE COURT:  Okay.

14          MR ROOMBERG:  And leaving her niece as a hostage to

15  make sure the money is paid on the guns.  She was going to

16  leave her niece with the people, the people who are

17  supposedly selling the machine guns, as a hostage to ensure

18  that the money was going to be paid.  That's her family

19  values.  And we believe the guidelines are calculated

20  correctly.  We believe the sentence should be within the

21  guidelines.

22          In regard to whether or not she should have a bond,

23  the bond format changes after a guilty plea and sentencing.

24  As the Court said, trafficking in machine guns shouldn't be a

25  case where there is bond.  We would ask that she be sentenced

1   within the guidelines and that her bond be revoked.

2              THE COURT:  Okay.  Anything else, counsel?

3              MS. ROTH:  No, Your Honor.

4              THE COURT:  The Court having considered the

5   guidelines finds them fair and reasonable and will impose a

6   sentence of 87 months upon Yadira Mauricio Ybarra.

7   Thereafter, to be placed on supervised release for a period

8   of three years on two counts in docket Cause Number

9   11-368-01.

10             And five years on count one in docket Cause Number

11  11-CR-977 to run concurrent.

12             Additionally, pursuant to 18 US Code Section 363 --

13  rather 3663 AC-1, the Court orders the defendant to pay

14  restitution of a total amount of $133,846.09 to the victims

15  outlined in the presentence report joint and severally with

16  other co-defendants.  The Clerk's Office -- rather, the

17  judgment will detail more pertinent, relevant language in the

18  judgment.

19             While on supervised release, the defendant shall

20  comply with all mandatory and statutory standard conditions.

21  The Court advises the defendant you do have the right to

22  appeal this sentence unless previously waived.  And the Court

23  will order the presentence report sealed and made part of the

24  record.  And should the applications be -- application of

25  guidelines be appealed, the presentence report will be

1  available for appellate review purpose also.

2          Anything else, counsel?

3          MS. ROTH:  No, Your Honor.

4          MR ROOMBERG:  Your Honor, the government moves the

5  remaining counts in both indictments be dismissed.

6          THE COURT:  Okay.

7          CASE MANAGER:  Special assessment, Your Honor?

8          THE COURT:  Special assessment of $200.  Let me see

9  the lawyers up here for a second.

10          (Off-the-record, at sidebar.)

11          (End of sidebar.)

12          THE COURT:  All right.  The defendant will report

13  on or before 60 days beginning today.  Okay.  Thank you.

14  We're in recess.

15          THE CSO:  All rise.

16          (Adjournment.)

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT   )

WESTERN DISTRICT OF TEXAS      )

            I certify that the foregoing is a correct

transcript from the record of proceedings in the

above-entitled matter.  I further certify that the transcript

fees and format comply with those prescribed by the Court and

the Judicial Conference of the United States.

Date signed:    July 19, 2013.


                              /s/ Leticia Rangel
                              _____
                              **LETICIA RANGEL**
                              United States Court Reporter
                              655 East Durango Blvd., Suite 316
                              San Antonio, Texas 78206
                              (210) 244-5039